NOV 27 1953

## MEMORANDUM FOR THE ATTORNEY GENERAL

Re: Membership of Judge Parker on the International
Law Commission.

This is in regard to the State Department's and Judge John J. Parker's request for an opinion as to whether he may accept membership on the International Law Commission to which he was recently elected by the General Assembly of the United Nations, without violating any law of the country or vacating his office as Chief Judge of the United States Court of Appeals for the Fourth Circuit.

Judge Parker has rightly assumed that the opinion should be addressed to the Department of State, and I have set forth herein the several considerations involved in arriving at the view that there would be no violation of law or vacation of his judicial office if Judge Parker accepts membership on the Commission. However, I thought you might wish to consider whether you would include all or only some of these considerations in whatever opinion is finally given to the Department of State.

There is nothing novel in federal judges performing other assignments while holding judicial office, including assignments of international importance. In fact, Judge Parker himself served as an alternate judicial member of the International Military Tribunal established by the Governments of the United States, Great Britain, France, and the U.S.S.R. for the trial of persons charged with war crimes, which trials took place at Nurnberg. It was held that such service, without compensation, entered upon at the request of the President, would not vacate his judicial office. 40 Op. A. G. 423 (1945); and see Executive Order 9626 of September 24, 1945, 10 F.R. 12113, appointing Francis Biddle member and John J. Parker alternate member for the United States of the International Military Tribunal. 1/

1/ Justice Robert H. Jackson of the United States Supreme Court was designated and served as the United States representative and chief counsel in preparing and prosecuting the war crimes charges at Nurnberg under the four-power agreement, without vacating his judicial office. E. O. 9547 of May 2, 1945, 10 Fed. Reg. 4961; as amended by E. O. 9679 of January 16, 1946, 11 Fed. Reg. 703.

Other illustrations of federal judges serving in connection with important national and international matters from earliest to recent times are the following: Chief Justice Jay served as special envoy to England at the request of the President. Chief Justice Ellsworth served as special envoy to France. Chief Justice Fuller twice acted as an arbitrator of international disputes. Circuit Judge Putnam served as a commissioner under a convention with Great Britain concerning claims growing out of seizures of

Foot note 1 cont'd on next page.

The need for further consideration here arises by virtue of the nature of the membership of the International Law Commission, which is different in appearance from the usual membership in international commissions or bodies upon which United States judges or officers have heretofore served.

The International Law Commission was established on November 21, 1947, by resolution 174(II) of the General Assembly of the United Nations, pursuant to the Assembly's obligation under Article 13, paragraph 1(a), of the United Nations Charter to initiate studies and make recommendations for the progressive development of international law and its codification. The International Law Commission is composed of 15 members, elected by the General Assembly from a list of persons nominated by states members of the United Nations. The members selected must be persons of recognized competence in international law. Every member must be of a different nationality and the Commission as a whole must represent the chief forms of civilizations and the principal legal systems of the world. Every member holds office for a three year period and may be reelected. The members serve in their own personal capacity and are not representatives of governments. Each member is paid his travel expenses and a special allowance of $15 per diem, while on duty, by the United Nations. During the past five years, the Commission has met annually, usually in the summer months. The functions of the Commission are to promote, first, the progressive development of international law, by which is meant the preparation of draft conventions on subjects which have not yet been regulated by international law or in regard to which the law has not yet been sufficiently developed in the practice of states; and second, the codification of international law, which means the formulating and systematizing of rules of international law in fields where there already has been extensive state practice, precedent, and doctrine. The Commission has already done extensive work on such subjects as "Regime of the High Seas", "Arbitral Procedure", and "Nationality Including Statelessness".

The salient difference, distinguishing service on this Commission from previous commissions or bodies upon which federal judges and other United States officers have served, is the direct election of the member by the international organization, in this case the General Assembly, and the member's service in his personal capacity and not as a representative of his government. This separation of service from the representative capacity eliminates certain problems, which were

Vessels in the Bering Sea, 22 Op. A. G. 184 (1898). Justice Owen Roberts served as chairman of the board appointed by President Roosevelt to investigate the Pearl Harbor disaster of December 7, 1941.

troublesome but disposed of in the past in the representative cases, such as the dual compensation statutes, that appear to be even more remote here, cf. 22 Op. A. G. 184 (1898). [2] However, the independent service does raise a question, not present in cases where the judge or other officer was representing the United States, growing out of Article I, section 9, clause 8, of the Constitution, which provides that no person holding any office of profit or trust under the United States shall without the consent of the Congress accept any emolument or office of any kind whatever from any "king, prince, or foreign state."

[2] In this opinion, the question was whether U. S. Circuit Judge William L. Putnam, who with a British colleague, was appointed one of two commissioners under the 1896 convention with Great Britain for the disposal of claims arising from seizures of vessels in the Bering Sea, could be paid for his services as commissioner out of a fund provided by Congress. Attorney General Griggs ruled that he could be paid a sum in addition to his salary as judge. It was the Attorney General's view that the Dockery law of 1894, 5 U.S.C. 62, providing that no person who holds an office the salary or annual compensation to which amounts to $2500 shall be appointed to or hold any other office to which compensation is attached unless specially authorized by law, did not apply to the temporary commissionership created by treaty on the ground that it was not an office in the constitutional sense intended by the statute or in the popular sense; nor in any event, did Congress intend the statute to apply to temporary commissionerships created by international agreement, even if the employment could be deemed within the letter of the law. Likewise the Attorney General held that R.S. 1763, 5 U.S.C. 58, prohibiting payment of double salaries, and R.S. 1765, 5 U.S.C. 70, prohibiting the payment of additional pay or compensation, were inapplicable to the commissionership held by Judge Putnam.

In Judge Parker's case, membership on the International Law Commission in his individual capacity would be clearly not an office under the United States; and there is no payment of additional moneys or compensation by the United States, since his travel and per diem while on the Commission would be paid by the United Nations. Moreover, it is extremely doubtful that what he is to receive from the United Nations, comprising in effect reimbursement for out-of-pocket expenses for travel and living away from home, could be regarded as pay or compensation if these statutes were otherwise applicable.

Because constitutional provisions must be viewed in their broad intendment, and because international organizations like the United Nations and commissions like the International Law Commission were unknown to the period in which the Constitution was written, the question might properly be asked whether the United Nations or its agencies are within the class specified by Article I, section 9, from which office or emolument may not be accepted by an officer of the United States without the consent of the Congress.

Is the United Nations a "foreign state"? The answer has uniformly been that it is not.

The United Nations is an international organization of which the United States is a member pursuant to formal acceptance of the Charter of the United Nations as a treaty, 59 Stat. 1031. The membership is composed of states. Charter, Articles 3, 4. The organization itself is nowhere referred to as a state but "shall enjoy in the territory of each of its members such legal capacity as may be necessary for the exercise of its functions in the fulfillment of its purposes." Charter, Article 104. In commenting on this article, the Report to the President on the Results of the San Francisco Conference by the Chairman of the U. S. Delegation, June 26, 1945, (Department of State Publication 2349, Conference Series 71), said:

"This article does not deal with what is called the 'international personality' of the Organization. The Committee which discussed this matter was anxious to avoid any implication that the United Nations will be in any sense a 'super-state.' So far as the power to enter into agreements with states is concerned, the answer is given by Article 43 which provides that the Security Council is to be a party to the agreements concerning the availability of armed forces. International practice, while limited, supports the idea of such a body being a party to agreements. No other issue of 'international personality' requires mention in the Charter." Report, pp. 157-158.

In debating the ratification of the Charter in the Senate, there was disagreement among some of the Senators as to whether there might be formal treaties between the United States and the United Nations because the organization was not a sovereign state. A number of Senators thought this reason was immaterial in deciding whether there could be such formal agreements. But none disagreed with Senator Ferguson's statement that the United Nations is not a "sovereign state and we will all agree that it is not a super-state." 91 Cong. Rec. 7999-8000. (79th Cong., 1st Sess., 1945.)

More recently, the International Court of Justice had occasion to consider the juridical nature of United Nations. The Court came to the conclusion "that the organization is an international person. That is not the same thing as saying that it is a State, which it certainly is not, or that its legal personality and rights and duties are the same as those of a State. Still less is it the same thing as saying that it is 'a super-State', whatever that expression may mean. It does not even imply that all its rights and duties must be upon the international plane, any more than all the rights and duties of a State must be upon that plane. What it does mean is that it is a subject of international law and capable of possessing international rights and duties, and that it has capacity to maintain its rights by bringing international claims." Advisory Opinion, I.C.J. Reports 1949, p. 174, 179, re "Reparations for Injuries Suffered in the Service of United Nations."

Thus, in the view of its highest tribunal, as well as in the view of the responsible American officials who participated in forming the organization and making this country a member of it, there is no question that the United Nations is not a sovereign state or a foreign state. This view of the United Nations is made even plainer for us by the establishment of the seat of the United Nations in the United States, 61 Stat. 756. And, in addition to the pledges of participation and cooperation contained in the Charter, the Congress has made provision for United States participation in United Nations in the United Nations Participation Act of 1945, 22 U.S.C. 287 et. seq. Included is recognition that members of the Senate and House and officers of the United States may serve as representatives of the United States in United Nations organs and agencies. 22 U.S.C. Supp. V, 287(f). This, of course, would constitute express consent in the cases of representatives of the United States, if Article I, section 9, clause 8 were thought to be a cloud on their service absent consent. However, no adverse inference can or should be derived from the absence in this provision of reference to participation in other than a representative capacity,[3]/ since the concern of the statute, 22 U.S.C. Supp. V, 287(f), is with compensation for those who serve for the United States in a representative capacity.

Moreover, from the meager history and comment on Article I, section 9, clause 8 of the Constitution, there is little or no basis for regarding service on an United Nations commission, even in an individual capacity, as coming within the purpose of the Constitutional provision. The clause stemmed from a flat prohibition in Article VI of

3/ Compliance with the consent provision of Article I, section 9, clause 8 of the Constitution was found in a general statutory authorization for international exchange of meteorological information which, it was held, supported temporary acceptance of posts under the Government of Eire by U. S. Weather Bureau employees, and payment of compensation to them by that government. 40 Op. A.G. 513 (1947).

the Articles of Confederation which was modified in the Constitution to permit Congress to authorize the acceptance of office or honors. An explanation of its meaning was offered by Randolph at the Virginia ratifying convention. He said that the restriction was included in the Constitution to prevent corruption of one in office by his receiving or holding emoluments from a foreign state. Randolph referred specifically to our ambassadors receiving presents from foreign kings. 3 Farrand, Records of the Federal Convention, 327, citing Robertson, Debates of the Convention of Virginia, 1788, (2d Ed. 1805) pp. 331-345. But, as Attorney General Akerman observed in 13 Op. A. G. 537 (1871), a minister of the United States abroad is not prohibited by the Constitution from rendering a friendly service to a foreign power, even that of negotiating a treaty for it, provided he does not become an officer of that power by the acceptance of a formal commission which creates an official relation between him and the foreign government.

In relationship to the constitutional prohibition, there is nothing in membership on the International Law Commission comparable to accepting an office from a foreign government and all that it implies. No oath or change of allegiance is required of the commission member. He retains the nationality of the state of which he is a citizen and, as already described above, is expected to represent the civilization and legal system of which his nationality is representative. No two members of the Commission may be nationals of the same state. Thus, in a broad sense, a member is representing his state and its culture even though not directly appointed by it. In matters of judgment and voting, he acts in his individual capacity and is not subject to the directions of any government. In regard to emolument, it would appear that the members of the Commission are, in fact, receiving no more than reimbursement, from the international organization of the many countries including their own, for their travel expenses and the additional costs of living away from home while on duty in the form of a fixed per diem.

From the foregoing considerations it would seem that Judge Parker's service on the International Law Commission is not subject to nor violative of Article I, section 9, clause 8 of the Constitution. I might also say that I agree with the Department of State that his membership on the Commission would be entirely compatible with his service as a federal judge./4/ As noted above, the dual compensation statutes would not appear to be applicable.

/4/ 28 U.S.C. 454 makes it a crime for a federal judge to engage "in the practice of law." Undoubtedly private law practice is meant, but in any event membership on the International Law Commission would hardly be regarded as within the meaning of the statute. Compare the function of Mr. Justice Jackson in prosecuting the Axis war criminals.

The only further consideration relates to the policy of federal judges serving in non-judicial activities. In the 60th Congress, the Senate Committee on the Judiciary filed a report on the subject, S. Exec. Rept. No. 7, 80th Cong., 1st sess. (reprinted in 33 ABA Journal 792-796 (1947)). It struck hard against the use of federal judges for executive functions and invited the Chief Executive to use his good sense and discretion in preserving the independence and prestige of the Judiciary. However, the thrust of that report was at the participation of judges in executive branch functions which tend to subordinate the judge to the executive as well as keep him from his judicial activities. Here, service on the International Law Commission is directly related to Judge Parker's lifetime work as a judge and, from the past experiences of the Commission, will not require his attendance except during the vacation time of the federal courts. Further, the discretion of the President is not involved; rather it is the judgment of Judge Parker himself, who in his letter to you, has taken the view which is entitled to more or less controlling consideration on this aspect, that his service on the Commission will not interfere with the performance of his duties as a United States Judge.

J. Lee Rankin
Assistant Attorney General
Office of Legal Counsel